IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 22-cr-116 (CJN) |
| | ) | |
| DAVID JOSEPH GIETZEN | ) | |

**MR. GIETZEN'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD VARIANCE**

Defendant David Joseph Gietzen, by and through undersigned counsel, respectfully submits this sentencing memorandum seeking appropriate punishment that is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a). Mr. Gietzen submits the following to support his request for a downward variant sentence of 48 months of imprisonment.

**RESPONSE TO PRESENTENCE REPORT**

1. Factual Objections

According to the PSR, Mr. Gietzen was "able to strike the officer in the gaps in his protective gear near the armpit area." PSR ¶ 14. No such evidence was presented at trial. No witness testified to such a strike and no video or photographic evidence was shown to the jury that demonstrated such a strike. The only time this was mentioned was during the Government's closing argument. As this Court stated to the jury in the jury instructions, "The statements and arguments of the lawyers are not evidence." *See* Doc. 50, p. 6.

The PSR also contained several paragraphs that stated that Mr. Gietzen falsely testified at trial, alleging specifically that he "falsely testified that the only assault he intended to commit was the assault with the pole." PSR ¶ 17. The transcript of Mr. Gietzen's testimony contains no such

statement. Mr. Gietzen admits throughout his testimony to pushing the officers with his hands and attempting to use the flagpole to move an officer out of the way so that others could advance towards the Capitol. *See* Doc. 66, pp. 792-865; (828:7-8, 9-16; 830:8-9, 10-13, 20-24; 835:3-20).

2.   Objection to Guideline Computation

Mr. Gietzen objected to the application of the four-level enhancement in U.S.S.G. § 2A2.2(b)(2), for use of a dangerous weapon. PSR ¶¶ 59, 66. Mr. Gietzen will not argue the objection in this memorandum but would preserve it for appellate review.

### 3553(a) FACTORS

### History and Characteristics

David Gietzen was born in the Madigan Army Hospital at Fort Lewis in Washington State. When he was a year old, his family moved to North Carolina. His father was enlisted in the United States Army. When David was 7, his parents divorced. David's mother and his nine siblings stayed in their 1,300 sq. ft. 3-bedroom home until it was repossessed in May of 2003. They then moved to a trailer park in Cumberland County, North Carolina.

Throughout his childhood, David's family struggled financially. David was bright and found high school to be unchallenging; he did not apply himself. He attended community college for two years to save on the cost of college.  In 2014, he enrolled at N.C. State and spent six semesters earning two bachelors engineering degrees: Computer Engineering and Electrical Engineering.

In May 2017, David graduated Summa Cum Laude from North Carolina State University with a 4.0 grade point average. His transcript is attached and includes information that David was on the Dean's List for each semester he was enrolled.

Shortly after graduating from N.C. State, David was employed at Extron as a programming engineer. At the time he quit this job, he was earning $80,000 a year and frequently gave money to his family members to help them with expenses and bills. For David's humble family, this income was an incredible benefit.

On January 6, 2021, David was 28 years old.

Leading up to the election

On March 15, 2021, the National Intelligence Council declassified a report that identified foreign threats to the 2020 United States elections. The Council "assess[ed] that Russian President Putin authorized, and a range of Russian government organizations conducted, influence operations aimed at denigrating President Biden's candidacy and the Democratic Party, supporting former President Trump, undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the US."[1]

False claims of election fraud were spread by many individuals, including attorneys who have since been sanctioned by sister federal district courts. *See King, et. al. v. Whitmer et. al.,* E.D.M. (Detroit) 2:20CV13134, Doc. 172 at 3 ("*And this case was never about fraud—it was about undermining the People's faith in our democracy and debasing the judicial process to do so*.") (emphasis in original). These false claims of voter fraud were endorsed and broadcast by high-level political officials.

---

[1]National Intelligence Council, Intelligence Community Assessment. Key Judgment 2, pg. i Available at: https://www.dni.gov/files/ODNI/documents/assessments/ICA-declass-16MAR21.pdf (last accessed April 3, 2024).



David Gietzen believed these false claims. The impact of these false claims was so powerful that not only did David quit his $80,000/year job at Extron, he also made a series of decisions to participate in protesting the 2020 election. David peacefully participated in multiple Stop the Steal rallies prior to January 6. Doc. 66, pg. 813:20-22. This participation culminated in David's travel to the nation's capital on January 6, 2021.

### Need to Protect the Public and Deterrence

The flood of election information that David digested "three or four hours a day" for months is still with David. Doc. 66 at 810:11-14. David still believes that the 2020 election was stolen.

David grew up in impoverished circumstances and, after being hired by Extron, was a beautiful example of the American Dream come to life. Without the false claims of election fraud, David's life would have been different.

As a Criminal History Category I, he has zero criminal history points and absolutely no criminal history. "Criminal history score and Criminal History Category (CHC) are strong predictors of recidivism." Key Facts The Past Predicts the *Future: Criminal History and Recidivism of Federal Offenders*, The United States Sentencing Commission (March 2017). "Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest

- 4 -

rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points. Each additional criminal history point is generally associated with a greater likelihood of recidivism." Conclusion *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, The United States Sentencing Commission (March 2017).

"There are differences in the rearrest rates for offenders with different criminal history point scores within each CHC, but the largest differences are for offenders in CHC I, which includes offenders with a criminal history score of zero or one point." Key Facts *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, The United States Sentencing Commission (March 2017). "Offenders with zero criminal history points had a lower rearrest rate than offenders with one criminal history point (30.2% compared to 46.9%), a slightly longer median time to rearrest (27 months compared to 25 months), and less serious rearrest offenses (the most common being public order offenses compared to assault for offenders with one criminal history point)." Key Facts *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, The United States Sentencing Commission (March 2017).

David chose to testify at trial and his testimony was tantamount to an acceptance of responsibility statement. He denied no material fact and made no attempt to obfuscate his perception of the events that took place on January 6. David did not go to the Capitol on January 6 with the intention of hurting others. However, when he got to the Capitol, he participated with others in actions that caused physical and emotional harm to officers and others.

David's current philosophy is that he no longer wishes to be engaged with the political

process. His involvement with politics has concluded and should be an indication to the Court

that he is no longer interested in being a threat to the public or political process.

<u>Deterrence Theory Rests on Outdated Philosophy</u>

"The theory of deterrence contends that when applied appropriately, punishments can

effectively shape behavior so as to prevent future offending."[2] Pathinayake at 66. "Although the

definition of deterrence and its relation to punishment has changed over time, and continues to be

in flux to this day, a historical look at the development of deterrence theory gives insight as to

how and why deterrence and punishment have intertwined." Pathinayake at 66.

"Deterrence theory relies on three variables which affect its calculus and capacity to deter

offenders from committing crimes." Pathinayake at 79 (citing Jay Livingston, Crime &

Criminology 501 (2d ed. 1996)). "The three variables are: (1) the certainty of punishment; (2) the

severity of the punishment; and (3) the celerity (swiftness) with which the punishment is

imposed." *Id*.

This may also make intuitive sense. Deterrence theory relies on the ability of humans to

process and learn from the mistakes of others. Take, for example, a hot stove observed by two

children. If Child A touches the hot stove, but then immediately (celerity) pulls the hand back,

and waves his hand while saying, "ow!" (certainty) then that is likely to deter Child B from

touching the stove. Contrawise, if Child A touches the stove, but keeps their hand in contact with

---

[2] Should We Deter Against General Deterrence? Athula Pathinayake, 9 Wake Forest J.L. &
Pol'y 63 (2018) (Hereinafter, "Pathinayake").

the stove until Child B decides to also touch it, Child B has not been deterred; even if the stove was hot. The severity of the burn does not matter, because there was no certainty or celerity.

However, "the overwhelming body of evidence in the criminological sphere does not suggest *any significant benefit to crime reduction through the imposition of lengthier sentences*… a number of [other] methods have been identified, including social apprehension of offenders and enhancing the certainty and celerity of punishments." Pathinayake at 114 (emphasis added). These methods have "been demonstrated to reduce offending far more reliably than deterrent effects." Pathinayake at 114.

Thus, "The calibration between objective punishment risk and citizens' perceptions of those risks is necessarily a function of the criminal justice system's ability to communicate those risks to the population." Nixon at 432.[3]

Not Only Are Harsher Punishments Not Effective, The Public Does Not Meaningfully Know About Them

For deterrence to have any potential impact, the public must be aware of the imposition of punishment. Even if punishment is consistently and swiftly meted out, if the broader society does not gain sufficient knowledge of the potential consequences of their actions, deterrence is impossible.

"In one of the first studies to directly examine the issue, Kleck et al. (2005) estimated the correlation (i.e., calibration) between objective punishment risk and perceptions of punishment risk by drawing on a random sample of 1500 respondents from 54 counties across the US. These

---

[3] Nixon, Timothy, Calibrating Student Perceptions of Punishment: a Specific Test of General Deterrence, American Journal of Criminal Justice (Nov. 2018). Available at: https://link.springer.com/article/10.1007%2Fs12103-018-9466-2. Hereinafter: "Nixon."

scholars sought to determine how strongly correlated objective indicators of punishment risk (i.e., the county-level arrest rate, sentencing rate, punishment severity, and punishment swiftness) were with citizens' perceptions of those same outcomes. To gauge perceptions of punishment severity, for example, Kleck et al. (2005) asked the respondents to report the number of crimes—out of 100—in their county that eventually ended in a jail or prison sentence. *Their analysis revealed no consistent association between objective sentencing rates and perceptions of those sentencing rates.*" Nixon at 432 (emphasis added).

However, while there is no association for sentencing rates and perceptions of those sentences, the Nixon study did find that participants could somewhat successfully compare different crimes for seriousness. As in, participants could identify which behaviors are punished most severely relative to other behaviors, but they could not identify specific punishment levels with any precision.

> Nixon summarizes how individuals form perceptions of punishment risk as follows:
> "Behavioral economists and psychologists have shown that humans use convenient, cognitively inexpensive information to form their beliefs about everyday risks (Kahneman, 2011). Given the difficulty of obtaining precise and accurate measures of objective punishment levels (see, for example, the arguments spelled out by Braga & Apel, 2016), it seems safe to conclude that accurate information about objective punishment risks are even more difficult to come by for the average citizen. In short, objective punishment levels are not convenient to locate, making them expensive to use when forming perceptions. This all suggests that people use other sources of information (i.e., heuristics) to form their perceptions of punishment risk (see Sampson & Raudenbush, 2004 for additional evidence that suggests individuals' perceptions are linked to more convenient indicators that may only loosely relate to the actual information that is being requested)." Nixon at 451.

There is such a choke point or restriction on the flow of sentencing information that individual sentences are often meaningless for the prospect of general deterrence. The

information choke point may be with the dissemination of sentencing information, or the public's ability to process the information above the fray of confusing information, but, as the study above shows, it exists. Moreover, the national media's politization of the January 6 insurrection has further clouded the public's ability to derive meaningful deterrent impact from the J6 prosecutions.

### The Need to Avoid Sentencing Disparity

In *United States v. Michael Steven Perkins*, 1:21CR447-4-CJN, Mr. Perkins faced charges similar to Mr. Gietzen's. Mr. Perkins was charged in a six-count superseding indictment with the following: Interfering with Law Enforcement During Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §  1752(a)(4) and (b)(1)(A), and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F)[4] Following a bench trial, he was convicted of all counts.[5]

---

[4] 1:21CR447-CJN, DE 249
[5] *Id.*

Mr. Perkins' conduct was described in a United States Department of Justice Press Release ("DOJ Press Release")[6] as follows: "According to evidence and testimony presented at trial, Perkins traveled to Washington, D.C., to attend the "Stop the Steal" rally on Jan. 6, 2021. When the rally concluded, Perkins marched toward the Capitol with a group of co-defendants, trespassing over the restricted perimeter that had been established, and made their way to the West Plaza of the Capitol building. Shortly after 2:00 p.m., Perkins helped a co-defendant in an attempt to charge and break through a police line by pushing him from behind into the line. As police descended into the crowd to assist another officer, Perkins picked up a flagpole and thrust it into the chest of an approaching officer. Perkins then raised the flagpole over his head and swung it down, striking two officers in the back of their heads. After the police line broke, Perkins moved closer to the Capitol building and climbed up the inaugural stage, then ascended to the building's Upper West Terrace. All told, Perkins spent at least three hours in the restricted Capitol grounds on January 6, 2021."

At sentencing, the Government recommended that Mr. Perkins, whose guideline range was 87-108 months,  receive a sentence of 90 months.[7] This Court varied downward and sentenced Mr. Perkins to 48 months imprisonment and 36 months of supervised release.[8]

Although Mr. Gietzen was convicted of assault using a dangerous weapon, the facts of his case differ markedly from those of Mr. Perkins. Mr. Perkins actually struck two law enforcement officers in the back of the head with a flagpole. Mr. Gietzen caused no injuries to any law

---

[6] DOJ Statement - District of Columbia | Florida Man Sentenced for Assaulting Law Enforcement During Jan. 6 Capitol Breach | United States Department of Justice
[7] 1:21CR447-CJN, DE 249
[8] 1:21CR447-CJN, DE 273

enforcement officer, either with his hands or with a flagpole. Additionally, unlike Mr. Perkins, Mr. Gietzen did not assist others in entering the Capitol, nor did he enter the Capitol.

In *United States v. Elliot*, 1:21CR735-RCL, Mr. Elliott pleaded guilty to 18 U.S.C. § 111(a) and (b), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).

According to the Statement of Offense[9], Mr. Elliott, a member of the Northern Illinois Proud Boys, traveled to Washington, D.C. from Illinois for the purpose of protesting Congress' certification of the Electoral College. On the morning of January 6th, he acquired a ballistic vest and also equipped himself with a helmet, hard-knuckle gloves and a BaoFeng radio. He also carried a flag with a wooden pole. Mr. Elliott marched to the Capitol crossing over clearly toppled barriers as he arrived at the west plaza. Mr. Elliott faced the crowd of rioters behind him and yelled a phrase inspired by a battle cry from the movie "300:" "Patriots, what is your occupation?" to which he responded, "Ah-ooh! Ah-ooh! Ah-ooh!" while thrusting his flagpole in the air. Approximately six minutes later while officers were attempting to replace bicycle rack barriers to hold back the mob on the lower west terrace, Mr. Elliott swung his flagpole at officers and then thrust it forward into the police line, making contact with at least one officer. Mr. Elliott then advanced to the base of the inauguration scaffolding, where he repeated the battle cry. He was repelled by chemical irritants and did not advance further toward the Capitol building. After Jan. 6, Mr. Elliott sent text messages describing his actions, saying, among other things, "I bonked 2 cops … never thought I'd say that lol."[10]

---

[9] 1:21CR735-RCL, DE 27
[10] *Id.*

The Government recommended a sentence of 41 months for Mr. Elliott, whose guideline range was 37 to 46 months.[11] Mr. Elliott ultimately received a sentence of 37 months incarceration, plus 36 months of supervised release.[12]

While it is true that Mr. Elliott pleaded guilty and Mr. Gietzen went to trial, the facts of Mr. Elliott's cases are much more egregious than those in Mr. Gietzen's. As noted above, Mr. Gietzen did not cause injuries to any officer. He did wear a helmet, knee pads and goggles, but only to protect himself because he was afraid of being assaulted by others, such as members of Antifa. He did not prepare to engage in battle by wearing a ballistic vest and hard-knuckle gloves to the rally. He did not attempt to rile up the crowd with a battle cry.

In *United States v. Thomas Webster*, 1:21CR208-APM, Mr. Webster was convicted after a jury trial of the same six counts as Mr. Perkins.

The DOJ Press Release[13] recited the following facts: "Webster first attended a rally and then moved to the Capitol, where he illegally entered the Capitol grounds. He wore a bulletproof vest and carried a large metal flagpole bearing the red and yellow flag of the U.S. Marine Corps. At approximately 2:28 p.m., Webster was among the mob on the other side of metal barricades set up by law enforcement officers attempting to secure the Lower West Plaza area of the Capitol. Webster approached an officer from the Metropolitan Police Department who was behind the metal gates. Webster pointed his finger at the officer and began swearing at him, telling him, among other things to "take your sh--- off," an apparent invitation to the officer to take off his

---

[11] 1:21CR735-RCL, DE 40
[12] 1:21CR735-RCL, DE 43
[13] DOJ Statement - District of Columbia | Retired NYPD Officer Sentenced to 10 Years in Prison For Actions Related to Capitol Breach | United States Department of Justice

badge and fight.  Webster then aggressively shoved the metal gate into the officer's body. He raised the flagpole and forcefully swung it toward the officer. The officer managed to wrest the flagpole away. Webster, however, then broke through the metal barricade, tackled the officer to the ground, and tried to remove his helmet and gas mask, choking him. During this attack, the officer struggled to breathe. While Webster had the officer restrained on the ground and unable to breathe, others in the mob began kicking the officer. The officer sustained several injuries as a result of Webster's attack.

In Mr. Webster's case, the Government recommended a sentence of 210 months.[14] Mr. Webster's guideline range was 210-240. The sentencing court varied downward and sentenced Mr. Webster to 120 months and 36 months of supervised release.[15]

Mr. Webster, who went to trial, exhibited conduct that was far more violent and destructive that Mr. Gietzen's. Mr. Gietzen briefly carried a flagpole made of PVC pipe, not metal. He did not bring the flagpole to the rally, he found it on the ground and dropped it several minutes later after thrusting it towards officers. As noted above, Mr. Gietzen did not wear a bulletproof vest. He did not verbally taunt officers with the intent of challenging them to a fight. And most importantly, he did not commit the type of violent assaults committed by Mr. Webster.

In *United States v. Josiah Kenyon*, 1:21CR726-CJN, Mr. Kenyon entered a guilty plea to 18 U.S.C. § 111(a) and (b), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).

---

[14] 1:21CR208-APM, DE 104
[15] 1:21CR208-APM, DE 110

On January 6, Mr. Kenyon, who was dressed as Jack Skellington from the movie *The Nightmare Before Christmas* attended the rally.[16] Mr. Kenyon entered the Capitol Building, remaining there from approximately 2:53 p.m. until 3:18 p.m.[17] During the time he was outside the Capitol Building, he, along with others damaged an exterior window, first using his fist, then a flagpole to hit the window, causing more than $40,000 in damage.[18] Mr. Kenyon then walked to the outside of the Lower West Terrace area. While there, he used a variety of objects to physically assault officers in the tunnel leading into the Capitol. He threw a large plastic pylon towards officers, striking one officer's riot shield.[19] He also struck officers with what appeared to be a table leg with a nail protruding from it.[20] He hit one officer in the leg, causing the officer to fall to the ground; the officer suffered pain and swelling to his right ankle. He then hit another officer in the head with the table leg momentarily lodged between that officer's helmet and face shield.[21]

At sentencing, the Government recommended a sentence of 88 months.[22] Mr. Kenyon received an active sentence of 72 months and 36 months supervised release.[23]

Mr. Gietzen never entered the Capitol and never damaged any of the windows, doors or assisted anyone else in doing so. Mr. Gietzen did not utilize a weapon with a nail in it to strike officers and did not throw large objects, such as a pylon at them.

---

[16] 1:21CR726-CJN, DE 32
[17] 1:21CR726-CJN, DE 20
[18] 1:21CR726-CJN, DE 20
[19] *Id.*
[20] 1:21CR726-CJN, DE 32
[21] 1:21CR726-CJN, DE 20
[22] 1:21CR726-CJN, DE 32
[23] 1:21CR726-CJN, DE 37

In *United States v. Matthew Jason Beddingfield* 1:22CR66-CJN, Mr. Beddingfield entered a guilty plea to 18 U.S.C. § 111(a), Assaulting, Resisting or Impeding Certain Officers. As part of the plea, the Government dismissed the remaining charges, including 18 U.S.C. § 111(b), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon.[24]

According to the Statement of Offense, on January 6, 2021, when Mr. Beddingfield traveled to Washington, D.C., he was out of custody on conditions of pretrial release in Johnston County, North Carolina, while awaiting trial on a charge of attempted murder.[25]  Prior to attending the rally, Mr. Beddingfield wrote to an unidentified Instagram user, "Anyone who is in antifa deserves a slow death. They are literally communists."[26] After arriving at the rally, Mr. Beddingfield jumped over a barricade and charged toward a group of U.S. Capitol Police officers who were near the scaffolding that had previously been erected outside the southwest side of the building.[27] Mr. Beddingfield attacked the officers, striking them with a metal flagpole he had brought with him.[28] He also threw a piece of the broken flagpole at law enforcement.[29] After attacking the officers, he faced the Capitol and made a gesture commonly associated with the Nazis. [30]He then entered the Capitol, making his way to the Rotunda before joining a group of rioters who attempted to storm the Senate wing.[31] Mr. Beddingfield was towards the front of the rioters and assisted the crowd's push against police officers.[32] Mr. Beddingfield and the other

---

[24] 1:22CR66-CJN, DE 56
[25] 1:22CR66-CJN, DE 40
[26] *Id.*
[27] *Id.*
[28] 1:22CR66-CJN, DE 48
[29] *Id.*
[30] *Id.*
[31] 1:22CR66-CJN, DE 40
[32] *Id.*

rioters retreated after a chemical irritant was deployed.[33] Next, he entered the office of then-Congressman Kevin McCarthy before finally leaving the Capitol.[34]  Over a year later, on January 19, 2022, Mr. Beddingfield wrote to an unidentified Instagram user, "I'd like to reclaim America and it is fine if a few of my peoples enemies are 'hurt' in the process."[35]

The Government recommended that Mr. Beddingfield, whose guideline range was 37-46 months receive an active sentence of 42 months.[36] Mr. Beddingfield was sentenced to 38 months incarceration and 24 months of supervised release.[37]

Mr. Beddingfield was allowed to plead guilty to a reduced charge. But his behavior on January 6 differed markedly from Mr. Gietzen's. Mr. Gietzen never entered the Capitol, unlike Mr. Beddingfield, who not only entered the Capitol, but also went inside a Congressman's office. He also did not strike officers with a metal pole and did not throw objects at them.

In *United States v. Peter Francis Stager* 1:21CR35-RC-2, Mr. Stager entered a guilty plea to 18 U.S.C. § 111(a) and (b), Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).

Mr. Stager was part of a large, armed mob that attacked police officers who had been defending the archway opening to a corridor leading from the Lower West Terrace to the interior of the Capitol building for nearly two hours, advancing, and retreating as rioters fought their way into the entrance.[38] Mr. Stager's co-defendants attacked the police line and dragged a police

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] 1:22CR66-CJN, DE 48
[37] 1:22CR66-CJN, DE 54
[38] 1:21CR35-RC, DE, 296

officer, facedown and headfirst, out of the line and into the crowd of rioters. [39]Once the others had dragged the officer into the crowd, Mr. Stager raised the flagpole that he was carrying and beat the downed police officer.[40] After assaulting the police officer, Mr. Stager ascended the steps toward the archway where a second officer was lying on the ground, fending off attacks from other rioters.[41] Mr. Stager stood over the officer and yelled, "Fuck you! Fucking traitor!"[42] Later in the day, Mr. Stager was filmed pointing at the Capitol building and stating, "Everybody in there is a disgrace. That entire building is filled with treasonous traitors. Death is the only remedy for what's in that building."  Mr. Stager went on to say that "Everybody in there is a treasonous traitor. Every single one of those Capitol law enforcement officers, death is the remedy, that is the only remedy they get."[43]

At sentencing, the Government recommended a sentence of 78 months.[44] Mr. Stager received a sentence of 52 months, with 36 months of supervised release.[45]

While it is true that Mr. Stager pled guilty, his actions included beating a downed officer with a flagpole and screaming obscenities at an officer who was lying helpless on the ground as others attacked him. Mr. Gietzen's conduct was far less egregious. He did not cause severely physical injury any officer nor did he act in concert with others to attack officers like Mr. Stager, and he did not engage in the violent rhetoric attributed to Mr. Stager.

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] 1:21CR35-RC, DE 333
[45] 1:21CR35-RC, DE 345

In *United States v. Rodney Kenneth Milstreed* 1:22CR198-JEB, Mr. Milstreed pleaded guilty to Assaulting Federal Officers, in violation of 18 U.S.C. § 111(a) and (b); Assault in violation of 18 U.S.C. § 113(a)(4); and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.[46]

Prior to January 6, 2021, Mr. Milstreed made plans to attend the "Stop the Steal Rally" and attempted to recruit friends to join him, making online comments and social media posts expressing his displeasure with the results of the election and his willingness to engage in violence.[47] In preparation for the event, he injected steroids in order to get "jacked."[48] In several of the messages, he included photos of his weapons. He also included pictures of steroids which he claimed got him "jacked." He went to the Trump rally solo, carrying a pick handle with a flag affixed to it.[49] During the chaos, Mr. Milstreed threw a smoke grenade towards law enforcement officers.[50] While on the Upper West Plaza, Mr. Milstreed launched the wooden pick handle into a line of officers, hitting one of them in the head.[51] The club bounced off of the officer's helmet and hit another officer in the head, causing him to sustain a concussion.[52] Mr. Milstreed then physically assaulted a photographer, shoving him and yanking him down a set of steps.[53] As he prepared for the events of January 6, Mr. Milstreed sent numerous photos of weapons and ammunition to others via social media along with exhortations of the violence he intended to commit. [54] After Mr.

---

[46] 1:22CR198-RC, DE 39
[47] 1:22CR198-RC, DE 31
[48] *Id.*
[49] 1:22CR198-RC, DE 39
[50] *Id.*
[51] 1:22CR198-RC, DE 31
[52] *Id.*
[53] *Id.*
[54] *Id.*

Milstreed was taken into custody, FBI agents discovered numerous firearms and firearm-related accessories, including assault rifles and boxes of ammunition in his home.[55]

The Government requested an active sentence of 78 months.[56] Mr. Milstreed, whose guideline range was 63-78 months, received a sentence of 60 months incarceration and 24 months of supervised release.[57]

Mr. Milstreed's violent conduct, before during and after the events of January 6 far exceeds anything that Mr. Gietzen did. Mr. Gietzen did not consume steroids, amass a cache of weapons, ammunition, and other weapon-related accoutrement in preparation for the rally. He did not cause any severe injury to law enforcement officers, much less a concussion by launching a pick handle disguised as a flagpole at them. He did not engage in the extreme level of violent rhetoric before, during and after the rally. Unlike Mr. Milstreed, Mr. Gietzen's goal was not to commit acts of violence at the rally. He was initially there to protest and got caught up with the crowd.

---

[55] *Id.*
[56] 1:22CR198-RC, DE 39
[57] 1:22CR198-RC, DE 46

**Character Letters**

The 11 attached character letters provide insight into David's positive relationship with his family and community. The chart below provides a reference for the Court.

| # | Name | Relationship |
|---|------|-------------|
| 1 | Kimberly Neiss | David's mother |
| 2 | Mary Scrivens | David's oldest sister |
| 3 | Andrew Gietzen | David's brother |
| 4 | Tony Adames | Classmate at NC State |
| 5 | Joseph Snouwaert | Close friend |
| 6 | John Snouwaert | Close friend |
| 7 | Jacqueline Koller | Close friend |
| 8 | Thomas Gietzen | David's oldest brother |
| 9 | Kevin Collins | Close friend |
| 10 | Kiley Button | Close friend |
| 11 | Patrick Gietzen | David's second oldest brother |

**CONCLUSION**

For all the foregoing reasons, Mr. Gietzen respectfully requests that this Court vary downward from the advisory guidelines range and impose a sentence of 48 months.

Respectfully submitted, April 4, 2024.

Louis C. Allen III
Federal Public Defender

/s/ Lisa S. Costner                              /s/ Ira Knight
_____          _____
LISA S. COSTNER                              IRA KNIGHT
Assistant Federal Public Defender      Assistant Federal Public Defender
North Carolina State Bar No. 14308     North Carolina State Bar No. 43817
251 N. Main Street, Suite 849             301 North Elm St., Ste 410
Winston-Salem, NC 27101                  Greensboro, NC 27410
(336) 631-5172                                    (336) 333-5455
Email: lisa_costner@fd.org                 Email: ira_knight@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system which will send notification of such filing to the following:

Elizabeth Ericksen
Rebekah Lederer
Assistant United States Attorneys


Respectfully submitted,

LOUIS C. ALLEN III
Federal Public Defender


<u>/s/ Lisa S. Costner</u>
LISA S. COSTNER
Assistant Federal Public Defender