**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-116-CJN** |
| **DAVID JOSEPH GIETZEN** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence David Joseph Gietzen to 121 months of incarceration, 36 months of supervised release, $2,000 in restitution, and the mandatory special assessment of $710. The government's recommended sentence is at the midpoint of the sentencing guidelines incarceration range of 108 to 135 months as calculated by the U.S. Probation Office and which the government submits is the correct Guidelines calculation.

## I.    INTRODUCTION

The defendant, David Gietzen participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Gietzen, a 30-year-old college graduate who was previously employed as a programming engineer, travelled with his brother from their home in North Carolina to attend the "Stop the Steal" rally held on January 6, 2021. Following the rally, Gietzen marched to the Capitol to further protest and express his anger about the results of the 2020 election. Sometime before 2:00 p.m., Gietzen entered the Capitol's restricted grounds on the west side and made his way to the West Plaza. At this location, officers with the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") had formed a defensive line, using bike racks, just below the Inaugural stage. Gietzen, now outfitted in a helmet, goggles, and knee pads, moved to the front of the crowd where he faced off with police, screaming at officers and telling them they were "a complete fucking disgrace." During the standoff, Gietzen ignored commands to leave the grounds. Instead, Gietzen pushed against the police line, and between 2:13 and 2:15 p.m., assaulted a group of officers by pushing and pulling against their bodies and shields. In addition to contributing to the rioters' push against multiple officers, Gietzen personally assaulted officers and on one occasion using a long pole. In total, Gietzen was illegally present on the Capitol grounds from at least about 2:10 p.m. until at least 4:00 p.m., significantly contributing to the chaos of that day.

The government recommends that the Court sentence Gietzen to 121 months of

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

incarceration for his conviction, following a jury trial, on all eight counts in the indictment against him, namely: 18 U.S.C. § 231(a)(3); three counts of 18 U.S.C. §111(a)(1) and/or (b), 18 U.S.C. § 1752(a)(1) and (b)(1)(A); 18 U.S.C. § 1752(a)(2) and (b)(1)(A); 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and 40 U.S.C. § 5104(e)(2)(F). A 121-month sentence reflects the gravity of Gietzen's conduct, his lack of remorse, and the fact he refuses to accept any responsibility whatsoever for his violent actions.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Gietzen's Role in the January 6, 2021 Attack on the Capitol

Gietzen traveled from North Carolina to Washington, D.C. on January 5, 2021, to protest the results of the 2020 Presidential Election. Gietzen attended the former President's "Stop the Steal" rally at the Ellipse the morning of January 6, 2021 ("January 6"), and later marched to the Capitol. Gietzen was outfitted for battle, perhaps not in formal military gear or body armor, but outfitted in protective clothing, nonetheless. He wore a bright green rain jacket and carried a baseball helmet, goggles, and knee pads. After illegally entering Capitol grounds, Gietzen, clearly happy and pleased, holding two thumbs up, sent a photo of himself in front of the Capitol to his friends and family as shown in Image 1.



***Image 1: Gietzen proudly poses on Capitol Grounds (Government Trial Exhibit 702.6)***

**1. Gietzen's Multiple Assaults**

**a. Assault 1 (Count Two)**

Sometime before 2:00 p.m., Gietzen made his way to the West Plaza. At this location, USCP officers had formed a defensive line, using metal barricades resembling bike racks, just below the Inaugural stage. Due to the building hostility and size of the crowd, MPD officers were called in to assist. Gietzen, having put on the helmet, goggles, and knee pads, moved to the front of the crowd where he faced off with police. During this standoff, Gietzen ignored commands to leave the grounds. Instead, Gietzen pushed against the police line, and between 2:13 and 2:15 p.m., assaulted officers by pushing and pulling against officers' bodies and shields as depicted in Image 2 (GEX 512). *See also* Tr. Tran. 8/29/23 at 499. Specifically, MPD Officer Chad Curtice was

positioned near Gietzen during his assaultive pushes. Officer Curtice described his injuries, from the weight of the crowd's pushes, as "muscle strains throughout [his] whole body." *Id*. After this assault, Gietzen stayed at the front of the crowd, yelling "fucking disgrace" at officers and chanting "We Want Trump!"



*Image 2 – Gietzen (yellow circle) pushing on riot shield (government trial exhibit 512)*

    b.   Assault 2 (Count 3)

At 2:28 p.m., Gietzen again began an assaultive spree against USCP and MPD officers, among them USCP Sergeant Justin Cohen, by pushing against them. Sgt. Cohen (circled in red in Image 3) testified that his shins and arms were bruised for several days from the bike racks being pushed into him by the crowd. During this assault, Gietzen's actions were part of a larger group effort to overrun officers on the West Plaza. This effort was successful, and as the line of officers fell, Gietzen assaulted an officer by shoving him (Image 4) and grabbed the face mask of another officer as depicted in in Images 5.



*Image 3 - Gietzen (yellow circle) pushing against Sgt. Cohen (red circle) and other officers' line*
*(government trial exhibit 510)*



*Image 4 - Still from video showing Gietzen shoving an officer (yellow circle)*
*(government trial exhibit 521at 00:04)*



***Image 5- Still from video showing Gietzen grabbing an officer's gas mask. (yellow circle) (government trial exhibit 521 at 00:16)***

At 2:31 p.m., as officers retreated, Gietzen followed, moving toward the Capitol building and assaulting an officer with a long pole by jabbing the officer twice. A group of rioters had been pushing a large piece of plywood against this and other officers, distracting the officers, and Gietzen was able to strike the officer in the gaps in his protective gear near the armpit area as shown in in Images 6 and 7.



*Image 6- Gietzen using a pole to assault officers (yellow circle) (government trial exhibit 528)*



*Image 7 –Gietzen (yellow circle) striking officer with long pole (government trial exhibit 525 at 00:11)*

Gietzen then imbedded himself in the mob of rioters pushing and obstructing officers at the Lower West Terrace tunnel from approximately 3:40 to 4:00 p.m. as shown in Image 8.



*Image 8 – Still showing Gietzen (yellow circle) pushing against officers protecting the Capitol
(Government Exhibit 530 at 3:18)*

### Gietzen's Statements following January 6

Gietzen was proud of his actions on January 6 and, in its aftermath, bragged to his friends and family about his participation in the riot. These messages reveal not only a total lack of remorse, but an eager expectation of more violence. Gietzen said he had "never been prouder to be an American" on what he believed was a "beautiful day" and excitedly anticipated armed civil war, coinciding with the inauguration of President Biden, as the inevitable next step.

Unfortunately, it seems civil war is all but assured now. Word on the street is that the next rally is on the 20th,  and people are bringing their guns this time. This rally is with or without trump. We arent his employees, and if he chooses to concede to election fraud, that is treason. There is no giving up permitted when it comes to the future of the world.

*Image 9 –government trial exhibit 702.2*

Ive never been prouder to be an american than todays protest. Word is, next one is on jan 17

*Image 10 –government trial exhibit 702.3*



*Image 11 –government trial exhibit 702.4*

Btw they are trying give credit to storming congress on the news to antifa.... BULLSHIT, I was there in the hallway helping to push the line of guards back. Today was 100% what happens when you piss of normal people, and the next protest is going even further.

*Image 12 –government trial exhibit 702.4*

### Gietzen's Obstruction of Justice

Gietzen falsely testified that the only assault he did not intend to commit was the assault with the pole. Gietzen testified that he simply sought to "move" the officers out of his way even though the video clearly showed him thrusting a pole at officers already under attack.

Specifically, the following testimony occurred during cross-examination of Gietzen:

| | |
|---|---|
| Ms. Lederer: | And again, you struck officers with the pole? |
| Gietzen: | Yes, and the riot shield. |
| Ms. Lederer: | You said on direct examination that's so they would move? |
| Gietzen: | Yes. |
| Ms. Lederer: | Why would they need help moving? |
| Gietzen: | They need to move out of the way so that the protestors could progress to the Capitol building and occupy it. |
| Ms. Lederer: | Were your hands not enough? You had already used them multiple times before? |

| Gietzen: | Right. I mean, it's a thing of opportunity. I mean, people are using everything that is available to them at that point in time. And the piece of PVC looked like it might be effective at moving them out of the way but it wasn't so I dropped it. |
| Ms. Lederer: | But you intended to touch the officers with that PVC pole? |
| Gietzen: | I intended to push them out of the way. |

Tr. Trans. 8/30/24 at 846-847.

This claim of simply intended to touch the officers and not jab them with the pole as is clear from the evidence presented at trial, specifically (1) video evidence that showed officers whom he assaulted that had not been in his way; and (2) video evidence showing him engaged in assaultive conduct that did not simply move officers out of the way, such as Gietzen grabbing an officer's gas mask. U.S.S.G. § 3C1.1 n.4(B).

Secondly, in addition to the utter disrespect Gietzen demonstrated for law enforcement and the authority in general as demonstrated by the evidence presented at trial, Gietzen also failed to respect the Court's authority when he failed to surrender to the custody of the Bureau of Prisons when directed to do so by a Court Order. A bench warrant was issued on November 15, 2023, and Gietzen was arrested at his mother's home in North Carolina pursuant to that warrant on December 12, 2023. Gietzen did not turn himself in despite having knowledge of the warrant and he failed to appear for several status hearings during that time as well.[2] Further, Pretrial Services noted in a report filed on October 26, 2023 that "[t]he defendant was scheduled to self-surrender in this matter on 10/20/2023. The defendant failed to surrender as ordered by the court. PSA contacted U.S. Marshal Michael Montalvo and confirmed that the defendant failed to surrender on 10/20/2023.

---

[2] The Order was filed on PACER (ECF 63) and defense counsel advised the court they were at least was able to advise Gietzen's family, with whom Gietzen resided, of the contents of the Order, though due to attorney-client privilege, it is still not clear whether counsel spoke directly with Gietzen.

The Middle District of North Carolina attempted to contact the defendant on 10/24/2023 but was unsuccessful. A text message was also sent notifying the defendant to surrender as soon as possible. As of 10/26/2023, the defendant is not in the custody of the U.S. Marshals Service." Id. at 2. This conduct meets the requirements for applying the obstruction enhancement under U.S.S.G. § 3C1.1 n.4 (E).

### III.    THE CHARGES AND PLEA AGREEMENT

On April 1, 2022, a federal grand jury returned an indictment charging Gietzen with eight counts, including, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) ("Count One"); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §111(a)(1) ("Counts Two and Three"); Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §111(a)(1) and (b) ("Count Four"); Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) ("Count Five"); Disruptive and Disorderly Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) ("Count Six"); Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); ("Count Seven"); and Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) ("Count Eight"). On, August 31, 2023, Gietzen was convicted of all those offenses following a jury trial.

### IV.    STATUTORY PENALTIES

Gietzen now faces sentencing on all eight counts detailed above. As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to five years of imprisonment, a term of probation of not more than five years but not less than one year,

a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for Count One. For Counts 2 and 3, Gietzen faces up to eight years imprisonment, a term of probation of not more than five years but not less than one year, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. For Count Four, Gietzen faces up to 20 years imprisonment, a term of probation of not more than five years but not less than one year, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. For Counts Five, Six, and Seven, Gietzen faces up to 10 years imprisonment, a term of probation of not more than eight years, a term of supervised release of not more than one year, a fine up to $250,000, and a mandatory special assessment of $100. Finally, for Count Eight Gietzen faces up to six months imprisonment, a term of probation of not more than five years, $5,000 fine, and a mandatory special assessment of $10.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Id. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

The government agrees with the PSR calculations of the Sentencing Guidelines. Recent

amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Gietzen engaged in violence, including the assaults on MPD and USCP officers which form the basis for his convictions on Counts Two through Four and Seven.

The U.S. Probation Office calculated Gietzen's criminal history as category I, which is not disputed. PSR ¶ 80. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 31, Gietzen's Guidelines imprisonment range is 108-135 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gietzen's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Lastly, Gietzen intended to, and did aid in halting the Certification of the Electoral College vote. Gietzen planned for violence, bringing protective gear with him and donning it only after he got to the Capitol. Once there, Gietzen was a violent and active participant in that riot. He made his way to the one of the most violent locations that day— the West Front at the time of the initial breach of the police line. While there, he actively assaulted multiple officers and worked with the mob of rioters to not only remove the protective barriers but

use those barriers as weapons against the police. Among his assaults, Gietzen attacked an officer with a dangerous weapon—a long pole—which he thrust into weak points in the officer's defensive gear. Gietzen pulled at another officer's gas mask during a time when chemical irritants were being deployed. And all of Gietzen's violence was based on a lack of respect for law enforcement and the democratic process—its goal was to get himself and other rioters closer to the building so they could interfere with the certification of the election.

Gietzen's clear intent to commit such violent acts that day were of the utmost seriousness, and fully support the government's recommended sentence of 121 months' incarceration.

**B. Gietzen's History and Characteristics**

Gietzen comes before this court with no criminal history and a relatively stable upbringing Though the defendant grew up financially challenged, he has the love and support of his mother and siblings and received an outstanding college education, graduation with a 4.0 GPA and earning two degrees, one in Computer Engineering and the other in Electrical Engineering. At one time, he also was gainfully employed as a programming engineer. Clearly, Gietzen is bright and able to get something done when he puts his mind to it – be it a college degree or assaulting officers as part of in a violent mob. In addition to his education, Gietzen also had more advantages than many of the defendants who are before this Court, suffering no major illnesses or abuse, and continuing to receive the love and support of friends and family. This makes his decisions on January 6 all the more galling and demonstrates his utter disrespect for the law and law enforcement, a sentiment expressed during his trial testimony and in his disregard for the Order of this Court to self-surrender in October 2023.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233 (ABJ), Tr. Trans. 06/09/23 at 20. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Gietzen's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

At trial, three officers testified about the horror they experienced at the Capitol on January 6. In particular, a 16-year veteran of the USCP Sgt. Justin Cohen, testified that by them time

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Gietzen and other rioters and advanced to the point that he and other officers were pushed up against a wall on the west plaza, he said, "At this point, I distinctly remember sort of thinking we might not get out of here. I might not be going home tonight." Tr. Tran. 8/29/23 at 543. In addition, MPD officers Chad Curtice and Sgt. Jason Mastony testified at the unexpectedly large and violent mob they came upon when they arrived as backup at the Capitol that day. Neither of them had an idea what chaos awaited them, and neither were very familiar with the Capitol. In fact, Officer Curtice had never been there before. However, they and the other law enforcement officers on duty that persevered in an effort to keep rioters from the building, with all three officers suffering injuries as a result of their heroism that day.

In stark contrast to the bravery and selflessness exhibited by these officers, Gietzen testified about how being at the Capitol that day, and then staying after repeatedly being told to leave, "was the right thing to do" even though he was aware that officers did not want him on the Capitol grounds. Tr. Tran. 8/30/23 at 834. After listening to these officers testify and watching the violence of that January 6 replayed over the course of two days of trial, when Gietzen was asked about his conduct, he calmly acknowledged it was him pushing and assaulting officers both verbally and physically. Even more astounding, when asked if he was still not ashamed to admit that he was pushing officers, Gietzen replied, "I am not ashamed to admit it whatsoever. In fact, I still uphold that it was the right thing to do." Tr. Tran. 8/30/23 at 830. Further, Gietzen testified that he was not a particularly political person and that he did not vote in either the 2016 or the 2020 election, instead, he just went right to the rally and the Capitol on January 6 to demonstrate his anger against those he deemed responsible for what he deemed to be a fraud. Tr. Tran. 8/30/23 at 794-795, 800. All of this, along with other testimony and evidence presented at trial shows that Gietzen intended

to do exactly what he did on January 6, but it made clear that he has no remorse, even now, for the mayhem he was a part of that day.

Finally, even though Gietzen told the jury that he was not particularly active in politics and that made no prior efforts to peacefully express his distaste with the results of the election, the defendant nevertheless came to Washington D.C. and engaged in political violence because he thought the 2020 election was fraudulent. Given his lack of remorse, his disrespect for law enforcement, and his contempt for the democratic process, a significant sentence is needed to make sure Gietzen never again engages in political violence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Webster*, 21-cr-208 (APM), the defendant, like Gietzen, played a violent role in the attack on the Capitol. Webster was a former military member and retired police officer. Like Gietzen, Webster was an agitator who riled up the mob with his behavior. Webster violently attacked a police officer on the LWT, which resulted in opening a breach in the police line and a flood of rioters towards the Capitol. Like Gietzen, Webster did not plead guilty and was convicted of all charges following a jury trial, including a violation of 18 U.S.C. § 111(a) and (b). In addition, both defendants verbally taunted officers, and both received a 2-level enhancement for obstruction of justice. Further, although Webster received guidelines enhancements for wearing body armor and applying restraint to a victim, Gietzen was charged and convicted of three counts of assault compared to Webster's single count. Unlike Webster, Gietzen sent text messages after January 6 bragging of his exploits and pride in his actions, in addition to indicating a civil war was inevitable, making Gietzen's overall conduct more egregious. Judge Mehta sentenced Webster to 120 months of incarceration.

In *United States v. Josiah Kenyon*, 21-cr-726 (CJN), Kenyon plead guilty to violating Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). On January 6, Kenyon joined other rioters who breached the U.S. Capitol and spent approximately 30 minutes walking through the building. He used his fist and a flagpole to damage a large exterior window and he joined and participated in assaulting police officers with a large and violent group of rioters at the Capitol's Lower West Terrace tunnel. There, Kenyon used several large objects to violently assault officers attempting to the guard the tunnel

area. At one point, Kenyon used a table leg with a protruding nail to strike an officer in the leg and then to strike a second officer on the head such that Kenyon's weapon became lodged in the officer's face shield and helmet. Like Gietzen, Kenyon engaged in assaults against police in the most violent areas on the Capitol grounds that day. Further, though Kenyon was convicted of two counts of assault with a deadly or dangerous weapon and Gietzen was only convicted of one such count, Gietzen had more assaults of conviction overall. In addition, Gietzen did not accept responsivity for his actions, and he obstructed justice specifically in regards his denial of committing a violation of 18 U.S.C. § 111 (b) and in disregarding the court's order to self-surrender. Moreover, where Kenyon experienced many life struggles and expressed remorse from the start of his case, Gietzen had no similar struggles, and has shown time and again, that he has no remorse for his actions.

Finally, unlike both Webster and Kenyon, following his conviction, the Court ordered Gietzen to report to custody, which Gietzen completely disregarded. This pattern of flouting rules and laws and doing what he wants, regardless of the consequences, is how Gietzen operates. In order to deter Gietzen and others like him from such conduct in the future, a guideline sentence is appropriate, and the court should impose a sentence of 121 month's incarceration.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property ... including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Gietzen was convicted of violating seven offense sunder Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.");.

More specifically, the Court should require Gietzen to pay $2,000 in restitution for his

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts One through Eight. This amount fairly reflects Gietzen's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 121 months of incarceration, 36 months of supervised release, $2,000 in restitution, and the mandatory special assessment of $710.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    /s/ Elizabeth N. Eriksen
ELIZABETH N. ERIKSEN
VA Bar No. 72399
Trial Attorney, Detailee
601 D Street, N.W.
Washington, D.C. 20001
(202) 616-4385
elizabeth.eriksen2@usdoj.gov

/s/ Rebekah E. Lederer
REBEKAH E. LEDERER
Assistant United States Attorney
Pennsylvania Bar No. 320922
601 D St., NW
Washington, D.C. 20001
(202) 252-7012
rebekah.lederer@usdoj.gov